## SARVER v. LAWSON'S ADM'R.

Court of Appeals of Kentucky.

Jan. 22, 1954.

Rehearing Denied March 26, 1954.

J. R. Layman, R. M. Layman, Elizabethtown, for appellant.

J. E. Wise, Elizabethtown, for appellee.

MOREMEN, Justice.

Virgil H. Lawson was killed when struck by an automobile driven by appellant, Bradley Owsley Sarver. Appellee, Henry Lawson, administrator of the estate of Virgil H. Lawson, brought suit for damages which resulted in a judgment in the sum of $10,000.

At about 4 p.m. on Februrary 16, 1952, Bronner Lawson was operating an automobile westward towards Stephensburg in Hardin County on U. S. Highway 62 at a point about 10 miles from Elizabethtown. With him was his father, Virgil H. Lawson. The weather was not good, the road was wet, and intermittently it snowed or rained; however, the visibility was not bad. The automobile was stopped just off the traveled portion of the highway and Virgil H. Lawson alighted from the vehicle; went behind the car, lifted the lid of the trunk and took therefrom some groceries he was transporting. The driver of the car conversed momentarily with Ruby Jeffries who was standing on her porch across the highway and upon determining that decedent had removed the groceries, pulled back on the road and proceeded westward. Decedent then started across the road from the north to the south side and when he reached the edge of the south side of the traveled portion of the road he was struck by the automobile driven by appellant which was proceeding eastward in an opposite direction from that in which decedent had been traveling when he was riding in the automobile driven by his son.

Appellant believes the judgment should be reversed for the following reasons: (a) the court erred in refusing to sustain appellant's motion for a directed verdict because the proof and physical facts failed to show any negligence on the part of appellant, and the uncontradicted evidence conclusively established contributory negligence as a matter of law; and (b) the verdict was grossly excessive. A discussion of point (a) requires a summary of the evidence.

Appellee introduced, among others, the following witnesses:

1. Bronner Lawson, who stated that after his father removed the groceries from the trunk of the car, he (Bronner) pulled back on the road and proceeded westwardly for 250 feet where he met the car being operated in an easterly direction by appellant. He did not see the accident, but when he returned about 20 minutes later, his father's body was lying about 6 feet off the paved portion of the road. Groceries were scattered between Ruby Jeffries' house (which was directly opposite the point where he had originally stopped his car to let his father out) and his father's body.

The next day appellant visited him and his brother at which time appellant said, "I am sorry that I didn't see—didn't see him until he flew off the hood of my car." It was not snowing enough to impede vision and one could see a person or automobile 700 or 800 yards away. There were no skid marks on the highway at this point.

2. Mrs. John Wortham, who arrived at the scene soon after the accident, related that the body was 5 or 6 feet off the paved portion of the road. The groceries were all on the shoulder of the road.

3. Warner Waddell said that the body was approximately 5 or 6 feet off the paved portion of the road and the groceries were also spread off the road.

4. Albert Higdon testified that decedent's body was off the paved portion of the road with his head about 2 feet from the blacktop, the car was resting at the right edge of the shoulder of the road and the right wheels were off in the grass.

5. Ruby Jeffries testified that she saw decedent when he got out of the car on the shoulder of the road opposite her house and that he was standing on the far side of the road when she turned and went back into the house. She had closed the door when she heard the "lick" that killed Mr. Lawson. She was "scared" and did not leave her porch, after she returned to it, from which position she saw his body on the shoulder of the road with the groceries scattered along the side of the road.

6. Harvey Lawson, another son of decedent, corroborated his brother, Bronner, in affirming that on the day following the accident, appellant stated that "the only thing he saw was, when he flew up on the hood and he said, 'I just couldn't help it.' "

7. Lester Stillwell, who actually saw decedent struck by the car, recalled that he was driving west on Highway 62 and was about 600 or 700 feet away when he saw Lawson get out of the car and was about 250 feet away when he was hit.

Since his testimony is important, we will quote this portion of it:

"Q. At the time he was hit by the defendant's car, where was he with reference to the pavement? A. Well, he was—you mean when the car hit him where was Mr. Lawson?

"Q. No; I mean at the time he was hit, was he on the pavement or at the edge of the pavement? A. He was at the edge of the pavement.

"Q. On which side? A. On the left hand side from me.

"Q. As you go towards Stephensburg? A. That is right.

"Q. Did you drive up there and immediately stop? A. Yes, sir.

"Q. Were there any other cars there at that time? A. Not as I seen.

"Q. Were you close enough to the scene that the car that hit him had plenty of room to pull out and pass on the left? A. Should have had.

"Q. There wasn't any car between you and there going towards Stephensburg? A. No, there wasn't.

"Q. Now, where did Mr. Lawson's body stop? A. Stopped about—well, I say seven or eight foot below the blacktop road down on the gravel.

"Q. Seven or eight foot from the edge of the pavement? A. Somewhere along there. I didn't measure it.

"Q. Did you see his hat and groceries that were scattered along there? A. Yes.

"Q. Tell the jury where his hat was. A. His hat was laying out here about two foot from the pavement of the highway, and the groceries, they kind of went angling—left, something like that and went angling seven or eight foot. They was laying down through there scattered out."

We believe the foregoing is a fair, although abbreviated, statement of the evi-

dence introduced by appellee. The appellant did not, at the close of appellee's case, move for a directed verdict and, instead, introduced proof in his own behalf. Therefore, because no motion for a peremptory instruction was made until conclusion of all the testimony, the appellee was also entitled to the benefit of any facts which were developed by the appellant in order to sustain his cause of action, as well as the facts appearing in his own evidence. Paducah Dry Goods Co. v. Thompson, 308 Ky. 12, 213 S.W.2d 440; and Nelson v. Black Diamond Mining Co., 167 Ky. 676, 181 S.W. 341. However, before a résumé of appellant's testimony is had, we believe it advisable to comment that in our opinion appellee's proof made out a case where the jury might reasonably infer and find from the facts proven that the decedent had succeeded in crossing the road before he was struck and fatally injured and that appellant failed in his duty to keep a lookout.

Evidence in behalf of appellant was given by the following witnesses:

1. Appellant, Bradley Owsley Sarver, described the circumstances at the point of contact as follows: "And just before I got even with him—I don't know how close I was to him—I was a car length or two car lengths to him, and he closed the door and started driving off, and just about that time his father run out from behind the car, and I was too close to stop. Just as I seen him, I applied my brakes, and the road being slick, and raining, I slid right on into him, and after that, why, I kindly passed out." He stated that decedent must have run out just about the time the car started and that the front of his car with reference to the other car must have been about 25 or 30 feet when decedent came out from behind it. He applied his brakes as soon as he saw him and his car traveled about 34 feet from the time he applied the brakes until it stopped. When he applied the brakes, the car commenced skidding or swaying and he pulled a little to the right, and when the car stopped, it was about half on the blacktop and about half on the shoulder. The right

fender headlight was broken and the hood was bent.

He also testified:

"Q. Well, I am asking you how far from the edge of the pavement—the left hand edge of the pavement as you go toward Stephensburg, was he? A. Well, he was about two or three feet, I imagine.

"Q. Two or three feet. You were not meeting any cars there, were you? A. I don't know; I was watching him.

"Q. Don't you know whether you were meeting any car, or not? A. I didn't see any. I was watching him.

"Q. You didn't see any cars? A. No, sir."

2. Juanita Van Meter stated that she was in a car following the one driven by appellant and was about 75 feet from his car when the accident occurred. She stated that decedent came from behind the car, ran to the middle of the road, hesitated a second and then ran in front of the appellant's car.

3. Anita Dean, sister of Juanita Van Meter, corroborated her testimony.

4. James C. Sarver, brother of appellant, who was riding with him, testified that decedent came from behind the car at a fast pace and was holding his head down; that his brother applied the brakes before the impact with decedent; that the car traveled a few feet after they hit him, perhaps 20 or 25 feet.

5. Gordon Oates, who was operating the third car in the procession led by appellant, testified that decedent ran into the path of the car driven by appellant and when appellant applied the brakes he went into a skid and then stopped; that he too went into a skid and recovered and passed appellant's car on the left. He stated that no traffic was coming in the left lane at the time. He estimated that he was about 180 feet from the lead car at the time of the accident.

6. Officer Mac E. Brady of the State Highway Police reported that he had made measurements at the scene of the accident and testified that the body was about 35 feet from where the groceries were first spilled; that most of the goceries were off the road but two or three slices of bread were on the road; that he measured the line of meal which had been spilled and it extended about 35 feet from the body. He testified that skid marks are not made on a wet asphalt road when the wheels are locked suddenly.

7. Oral Richardson testified that the line in which the groceries were strewn began at the edge of the highway and angled off towards the body; that no portion of them was on the paved part.

The foregoing evidence, although directly contradictory to appellee's evidence on some vital points, does, to a certain extent, strengthen the case made out by appellee because it was proven that the right front headlight was smashed and the hood dented, and Gordon Oates' testimony seems conclusive of the fact that there was ample room for passage on the left-hand side of the road.

We are familiar with the rule that one who is confronted with an emergency is not required to choose the best way to avoid danger or injury to another, and we believe the only reasonable conclusion that may be reached from all the evidence in this case is that decedent had reached the edge of the road before he was struck, and, if appellant had been keeping a proper lookout, the accident could easily have been avoided. A directed verdict is proper only when there is no conflict in the evidence or it is susceptible of but one interpretation by reasonable men. Kroger Grocery & Baking Co. v. Diebold, 276 Ky. 349, 124

S.W.2d 505. Furthermore, although each party's evidence is disparate insofar as it concerns the question as to whether decedent ran suddenly onto the road, the reasonable inference from all the testimony seems to be that he had reached the edge of the road before he was struck and, although there is a preponderance of testimony from which it may be inferred that this action by decedent was so sudden as to preclude the possibility of bringing the car to a halt in time to avoid striking decedent, still we have the positive testimony of Lester Stillwell that he was hit at the edge of the pavement at a time when there was plenty of room for appellant to avoid striking him. The case was properly submitted to the jury and its determination was conclusive of the facts. Bryson v. Raum's Adm'r, 243 Ky. 121, 47 S.W.2d 927.

There remains the question of whether the damages are excessive. The proof is meager. One brother testified that decedent was 64 years of age at the time of his death, and the other, that he was 68 years of age. It was shown that he was a strong, vigorous man and in good health. He owned a farm of 42 acres and grew crops each year. We believe the award of $10,000 is not excessive. In Allender Co. v. Browning's Adm'x, 242 Ky. 273, 46 S.W.2d 116, a case decided in 1932, year in which the value of the dollar was deflated, we held that $10,000 for the death of an able farmer of 58 years of age, who owned a farm and earned between $1,200 and $1,500 a year, was not excessive. In 1934, we held that $10,000 for the death of a 62 year old grocer earning $16 a week was not too much. Woltering v. Weber's Adm'x, 253 Ky. 55, 68 S.W.2d 440. The award in this case is sustained by those precedents.

Judgment affirmed.